UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| United States of America, | No. 19-20026 |
| Plaintiff, | Hon. Gershwin A. Drain |
| v. | |
| D-5   Santosh Reddy Sama, | **Offense:** 18 U.S.C. § 371 Conspiracy to commit visa fraud and harbor aliens for profit |
| Defendant. | |
| | **Maximum Penalty:** Up to 5 years |
| | **Maximum Fine:** $250,000 |
| | **Supervised Release:** Up to 3 years |

## GOVERNMENT'S SENTENCING MEMORANDUM

Defendant Santosh Sama is a foreign citizen who abused the student visa program so that he could remain and work in the United States illegally. Moreover, he and his co-conspirators recruited other foreign students to do the same. Sama, by far the most prolific, industrious, and involved recruiter, received in excess of $160,000 in profits for his and his associates' efforts. Accordingly, the United States of America respectfully recommends that the Court impose a sentence within Sama's properly calculated guideline range of **41 -51 months**. Such a sentence is necessary in light of the seriousness of the offense, the need to punish Sama, deter

Sama and others from committing the same misconduct, Sama's personal characteristics and to avoid unwarranted sentencing disparities.

## I.   BACKGROUND

Defendant Santosh Sama is a citizen of India who first traveled to the United States in 2014 on a temporary student visa known as an F-1 visa. (PSR ¶ 9). Before he could obtain his F-1 visa, Sama applied to study in the United States at a university through the Student and Exchange Visitor Program ("SEVP"), which is overseen by the Department of Homeland Security. (*Id.* at ¶ 10–11) (*see also* Dkt. # 80, Plea Hrg. Tr., PgID 256-257). Once accepted by a university—in this case Atlantis University in Miami, Florida — the school issued a "Certificate of Eligibility for Nonimmigrant Student Status," better known as a Form I-20. (*Id.* at ¶¶ 10–11)(*Id.* Dkt. # 80 PgID 256).

Sama's Form I-20 permitted him to enter the United States, (*Id.* at ¶ 12) (*Id.* Dkt. # 80 PgID 256) which he first did in December 2014. While in the United States, he used his Form I-20 for identification and proof of legal and academic status in the United States, and it also allowed for him to travel abroad and return to the United States. (*Id.* at ¶ 12) (*Id.* Dkt. # 80 PgID 257). For his Form I-20 to remain valid, Sama knew that he needed to maintain his status as a full-time student "making progress toward completion of [his] field of study," whether at his original school or any school to which he later transferred. (*Id.* at ¶ 13)(*see also* Dkt. # 80, Plea Hrg.

Tr., PgID 256-257). After spending about a week at Atlantis University in Miami, Florida, Sama transferred to Silicon Valley University in San Jose, California.

Sama's visa and Form I-20 also permitted him to participate in curricular practical training ("CPT"), which in essence permitted him to find gainful employment as long as he continued to attend classes and make academic progress toward his degree. (PSR, ¶¶ 14-15) (*Id.* Dkt. # 80 PgID 258).

From May 2017 through January 2019, undercover agents from Homeland Security Investigations ("HSI") posed as employees of the University of Farmington ("the University"), located in Farmington Hills, Michigan. (*Id.* at ¶ 16). The University had no instructors, no classes, and no educational activities. Rather, it was a fictitious university used by foreign citizens as a "pay to stay" scheme.  (*Id.* at ¶17).   Under the "pay to stay" scheme, foreign citizens would enroll with the University as "students," but they would take no classes nor attend any educational programs; instead, they would pay tuition so that the University would issue them Form I-20's that identified them as students making progress toward a degree, and if they desired, they could also seek gainful employment through the CPT program. (*Id.*).

SAMA BEGINS HIS RECRUITING RELATIONSHIP WITH THE UNIVERSITY

On February 13, 2017, Sama contacted the University to discuss enrolling in the University without attending classes in order to illegally work in the United

States and fraudulently maintain his immigration status. He told the HSI Agent that he and his friends were just looking for a way to maintain status and were not interested in attending classes. (*Id.* at ¶ 19) (*Id.* Dkt. # 80 PgID 258-59).   Below are excerpts of the several conversations Sama had with the undercover agents that day:

| | |
|---|---|
| U/C Agent: | Okay, so we do have a non-traditional program. So, what our non-traditional program involves... It basically involves… It doesn't really involve online, and it doesn't involve classes either. Basically, your work provides you credits towards your degree. |

         \*               \*              \*

| | |
|---|---|
| SAMA: | Is it, uh, is it mandatory to attend the classes? |
| U/C Agent: | Not on your… If you want… If you're going the traditional route, yes, it is. But if you're doing a non-traditional, there is no classes. |
| SAMA: | I'm looking for non-traditional. |

         \*               \*              \*

| | |
|---|---|
| SAMA: | Yeah, is there any referral, uh, amount? |
| U/C Agent: | I'm sorry? |
| SAMA: | Is there any referral [U/I] if I [U/I] any of my friend directed [U/I] |

[VOICES OVERLAP]

| | |
|---|---|
| U/C Agent: | [STAMMERS] I'm sorry, say that again. |
| SAMA: | Is there any referral amount do you have, if I refer any of my friends? |
| U/C Agent: | Oh, you know what? If you… Yeah, if you want, uh, if you have any friends or anything to sign up, we can always discuss that. Absolutely. |

Sama promised to call the U/C back in a half an hour. Sama quickly called back along with his first recruited "student" who was waiting to talk to the U/C Agent.

SAMA:   …. Yeah, Ali, uh… My… one of my friends want to… wants to join, but he has… when he's going … he wants…he's last day of tomorrow is the last day he has to change the college.

U/C Agent:   Okay.

SAMA:   Is it possible… Is it possible to change to your university?

U/C Agent:   He wants to… he wants to come in? Is that what it is? He wants to enroll?

SAMA:   Yeah, he wants to [STAMMERS] enroll.

U/C Agent:   Okay…
      *                    *                    *

U/C Agent:   So, is he okay with… Now, is he okay with the fact that we don't have an… it's not going to be any classes? Or…

SAMA:   Yeah, he's very comfortable with the classes, also.

U/C Agent:   Huh?

SAMA:   Yeah, one minute, Ali.

U/C Agent:   I'm sorry?

   [*Background conversation takes place between Sama and his "Student"*]

SAMA:   Yeah, Ali.

U/C Agent:   Yes.

SAMA:     Yeah, Ali, he's comfortable with the no classes.

      \*         \*         \*

U/C Agent:  …the non-traditional is not really approved by the Department of Homeland Security. So, yeah, because of that, and we… we want to protect ourselves, you understand? Discretion is very important to us.

SAMA:     Yeah, the thing is he don't want to attend any classes, he wants to be in California.

      \*         \*         \*

U/C Agent:  Yeah, that's fine, we can do that for him. But as long as he understands that, like, if he's ever questioned by anybody, anything, he …he's got to, you know… you know, I .. ah … we ask you to say, "hey yeah, I attend classes once a month and I have this… uh, you know, I have a curriculum." We ..we can always make that curriculum up for…for them. You understand?

SAMA:     Okay … okay, I got… I got your point.

U/C Agent:  I mean... And…and if you're… if he's comfortable with that.

SAMA:     Yeah, yeah. [STAMMERS] One more minute, Ali.

U/C Agent:  Yes, yes…

    [*Background conversation takes place between Sama and his "Student"*]

[VOICES OVERLAP]

SAMA:     Uh, [STAMMERS] if anybody asks, we are to say that, uh, "yeah, I'm the, uh, full time student," right?

U/C Agent:  [STAMMERS] I… a traditional student, yes. [STAMMERS] I… Yes. In… you know, honestly… Because [STAMMERS] we don't want our…

[VOICES OVERLAP]

6

SAMA:       Yeah.

U/C Agent:  …we don't… we don't want, obviously… you know, we don't want the law to basically come after us, you know? The legality …

[VOICES OVERLAP]

SAMA:       But the thing is that if anybody asks, we should tell that we are traditional students. We are not non-traditional [U/I] …

U/C Agent:  Yeah. So, what we do is we end up keeping… We do, even though you might… you're non-traditional, we do keep records on our end…

During his various phone calls and face to face meetings with the HSI Agent at the University, Sama continued his conversations regarding his enrollment in the school and to see if he could receive concessions for recruiting other students to the school. (*Dkt. # 80, Plea Hrg. Tr., PgID 259-260; 275*). Sama reached an agreement that he would receive a referral fee of $500 per student. (Dkt. # 80 PgID 263-264). During his discussions with the HSI Agent, Sama plainly stated that the only reason he wanted to attend the University was to maintain his status, and he knew that he and others were not going to be attending any classes and that such an arrangement was illegal. (Dkt. # 80 PgID 259; 275).

SAMA'S FIRST PAYMENT

On January 19, 2018, the undercover agent ("UCA") and Sama had a telephone conversation regarding Sama's planned trip to the University (January 22

and 23, 2018).   In preparation for the meeting, the UCA and Sama discussed how much money the University still had to pay Sama for the *enrolled* students that were recruited by Sama. Sama acknowledged that he had already received approximately sixty two thousand dollars in cash from the students (in the form of tuition payments). Sama had not sent this money to the University. Rather, Sama kept the sixty two thousand dollars in lieu of payment from the University for the recruitment of the enrolled students. This would account for one hundred twenty four enrolled students ($62,000 ÷ $500 = 124 students).

Sama also told the UCA that two hundred and six ("two 'ought' six") students had been sent to the school. After hearing Sama's claim of two hundred and six students, the agent insisted that he was not asking how many students Sama had sent to the school.   Instead, the agent requested Sama tell him how many of the recruited students had been *enrolled*. Sama asked for a few moments to give an accurate accounting of the enrolled students and came back to say that one hundred ninety six students had been enrolled. Sama then asked for the agent to give him twenty five thousand dollars – which represented a partial payment for 50 enrolled students ($25,000 ÷ $500 = 50 students).

The agent then asked Sama what he was going to do with the money he would receive at the meeting. Sama said that he was going to have his cousin and friends deposit some of his money, which would then be sent to him. Sama also told the

agent that Suresh Kandala would be coming along with him to the meeting, and that he and Suresh would physically carry some of the money back on the plane.

On January 22, 2018, Sama arrived at a scheduled meeting at the University to accept payment for recruited students and discuss future recruitment plans. In addition to bringing his associate Suresh Kandala to this meeting, he also brought along his ledger. Sama referred to his ledger a number of times during the meeting. This ledger (Attachment D) listed the number of students enrolled, students who may enroll in the future, and which of his associates had helped him in his recruitment efforts. (Dkt. # 80 PgID 266-269). Sama identified which of his associates recruited a particular student by listing students on a page under his associate's name or logging their assistance by placing a mark or initials next to the student's name (i.e. placing the initials "ph" for Phanideep Karnati, "P" for Prem Rampeesa etc.). (*Id.*)

Below, Sama and Kandala can be seen counting twenty thousand dollars (rather than the twenty five thousand dollars requested by Sama) that they received in exchange for the enrolled students from an HSI agent (whose image is obscured):



After counting out the money, Kandala placed the money it in his coat pocket while Sama reviewed his ledger of recruited students:



As of January 22, 2018, as a result of Sama keeping sixty two thousand dollars in cash from the students (in the form of tuition payments) and being paid twenty thousand dollars in cash by the UCA, Sama acknowledged his role in enrolling at least one hundred sixty four students ($82,000 ÷ $500 = 164 students).

SAMA'S SECOND PAYMENT

On June 8, 2018, Sama again travelled to the University to meet with the UCA to be paid. Sama initially met alone with the agent. Sama and the UCA were eventually joined by co-defendant Phanideep Karnati.

Before Karnati arrived, Sama had discussions with the UCA regarding how much he paid some of his associates (Prem Rampeesa, Suresh Kandala, Phanideep Karnati etc.) for recruiting students, and asked that the agent to not tell Prem and Phanideep that he was being paid five hundred dollars per student because Sama was only paying them three hundred dollars per student. During this conversation, Sama acknowledged that he had received approximately one hundred and ten thousand dollars in cash from the students (in the form of tuition payments). Again, Sama had not sent this money to the University. Rather, he kept the one hundred and ten thousand dollars as payment for the recruitment of the enrolled students. This would account for two hundred and twenty enrolled students ($110,000 \div $500 = 220 students).

The UCA then paid Sama twenty thousand dollars in cash.  This represented a partial payment for the students who had enrolled. This would account for forty additional enrolled students ($20,000 \div $500 = 40 students). As of March 8, 2018, Sama thus far has been paid for at least three hundred students (payment 1/22/18 – 40 students, plus the payment 6/8/18 – 40 students, and retention of tuition payments

11

for 220 students – (220 students + 80 students = 300 students).

Karnati eventually joined the meeting. During the meeting, Sama and Karnati touched upon various aspects of their joint recruitment activities. Later in the meeting the UCA asked about the number of students Karnati recruited. Karnati pulled out his computer and opened an Excel spreadsheet, which he referenced during the ensuring conversation. As the meeting was winding down, Sama took photographs of Karnati's Excel spreadsheet from Karnati's computer that he used to track his particular students. Sama then emailed the photographs to the UCA. Karnati's spreadsheet listed seventy four names.

### SAMA'S THIRD PAYMENT

On September 25, 2018, rather than Sama traveling to the University to be paid, the school wired money to Sama's bank account. The UCA wire transferred nine thousand dollars to Sama. This money represented a partial payment for student's enrolled by Sama. This would account for at least 18 additional enrolled students ($9,000 \div $500 = 18 students).

### SAMA'S RESPONSIBLE FOR OVER 300 ENROLLED STUDENTS

In total, Sama personally recruited and was compensated for well over three hundred students. He received profits – through a combination of tuition concessions and cash payments - in excess of one hundred and sixty thousand dollars from the University. (*Id.* at ¶¶ 19-27 (Dkt. # 80 PgID 272-273). At various times throughout

his recruiting efforts, Sama would email, or allow to be copied, various updated lists of the students that had been referred to the school. With each updated list, the number of recruited students would increase. (Dkt. # 80 PgID 264-272).

| Date | Number of students enrolled |
|------|------------------------------|
| September 18, 2017 | 31 Students (See Attachment A) |
| October 26, 2017 | 77 Students (See Attachment B) |
| November 9, 2017 | 93 Students (See Attachment C) |
| January 22, 2018 | 117 Students (See Attachment D) |
| August 29, 2018 | 497 Students (See Attachment E |

Sama has pled guilty to conspiring to commit visa fraud (18 U.S.C. § 1546(a)) and harboring aliens for profit (8 U.S.C. § 1324) in violation of 18 U.S.C. § 371— without the benefit of a Rule 11 agreement, although the government did offer one. (PSR, ¶¶ 1, 5). Sama's co-conspirators are the foreign citizen "students" he recruited and his subordinate recruiters - co-defendants. (*Id.* at ¶¶ 19-27).

The maximum sentence for his offense is not more than five years' imprisonment, a maximum fine of $250,000, and an applicable term of supervised up to three years. (PSR, p. 2; ¶¶ 61, 64, 69).

## II.   SENTENCING GUIDELINES CALCULATIONS AND § 3553(a) FACTORS

In determining an appropriate sentence, the Court should use the Sentencing Guidelines as a "starting point and the initial benchmark." *United States v. Lalonde*, 509 F.3d 750, 763 (6th Cir. 2007) (quoting *Gall v. United States*, 552 U.S. 38, 49 (2007)). Indeed, a sentence within the guidelines range carries a "rebuttable presumption of reasonableness." *United States v. Buchanan*, 449 F.3d 731, 734 (6th Cir. 2006). This is so because the guidelines "represent nearly two decades of considered judgment about the range of sentences appropriate for certain offenses." (*Id.* at 736) (Sutton, J., concurring). In particular, the guidelines aggregate the "sentencing experiences of individual judges, the administrative expertise of the [Sentencing] Commission, and the input of Congress…." *Id.*

Beyond the Guidelines, the Court should consider all of the factors set forth in 18 U.S.C. § 3553(a). *Gall*, 552 U.S. at 49–50. The § 3553(a) factors include:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
> (2) the need for the sentence imposed—
>> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>> (B) to afford adequate deterrence to criminal conduct;
>> (C) to protect the public from further crimes of the defendant; and
>> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; [and]
> \*\*\*
> (6) the need to avoid unwanted sentence disparities among defendants with similar records who have been found guilty of similar conduct….

18 U.S.C. § 3553(a).

### A.     Sama's Sentencing Guidelines

The government asserts that Sama's total offense level is 22 and his criminal history category is I, which results in a guideline range of **41–51 months**.

SAMA WAS ORGANIZER AND LEADER OF 5 OR MORE MEMBERS

Sama's conduct in this case demonstrates why a sentence within the guidelines is appropriate. Sama was the greatest driving force behind the enormity of the fraud. He recruited three times the amount of students than his next highest co-defendant. He made over $150,000 for his efforts. It was Sama who initiated contact with the school, negotiated the tuition and referral fees, and pulled together his group of friends, associates, roommates and acquaintances (collectively known as his co-defendants) to help drive students to the University.

In addition to actively finding students, Sama also organized and coordinated their paperwork: applications, acceptance letters, student identifications cards, false transcripts, various 1-20's for travel, university transfer and work authorization. For example, on August 10, 2018, Sama helped one of his students obtain false transcripts from the University, prompting an email for an undercover agent about the amount of time it would take to create a fake document for his student:

*Santosh,*

> *I will tell you what I told your friend… It takes 3-4 weeks to process the request for transcripts. Because he was enrolled under the "special arrangement" and not technically coming to classes, we have to deceitfully make up these documents for him. No one will be receiving transcripts until next week. Dr. Roberts handles the transcripts and he is out of the office this week. There is a long list of students who are requesting transcripts too. We will go in order of the request. We are not in a hurry to help Mr. Amplala because he failed to pay tuition.*

Sama's recruiting was so prolific that the University had to try to put a stop to his efforts by telling him that too many students had signed up, and that the authorities may suspect what they were doing. The undercover agent told Sama that the University could not accept any more students for a particular quarter and they would have to limit the number of students that could be accepted in the future. Undeterred, Sama and his associates continually badgered the undercover agent to accept their "cousin," "special friend," and the like. For example, in an email dated January 15, 2018, Sama wrote:

> "Hi Ali these students are waiting for acceptance letters according to our discussion in December you told me that, you will give 65 acceptance, but totally I had 80students for February from these only 50-60 students will join, some of them is looking for march , in  these 80 students only 10-15 students having jobs so I had talk with remaining students they agreed to use grace period for 15-20 days and they want to go for march .
> Till now I got 20 acceptance letters in that I got 2 march intake students and one 1 student who already enrolled for January student .
> The below list are for February intake send me those acceptance ASAP I will filter them as per our discussion 65 students, I had lot of pressure please make me out of this situation.
> Thank u."

Sama then attached a list of 66 additional students that he wanted to be enrolled at the school. It is important to note that these names also appeared in Sama's ledger that he brought with him on January 22, 2018. These 66 students were listed under "Feb" and were students Sama and his associates intended to enroll into the University in February 2018. These named students were in *addition* to the 117 Students were already enrolled at the University (See Attachment D).

On January 19, 2018, in an apparent attempt to circumvent the undercover agent's direction to limit the amount of students, Sama called one of the other undercover agents ("the Director of Administration"). Sama tried to convince the Director of Administration that Sama had been granted permission to enroll twenty more students. Sama then forwarded twenty student applications to the University.

It is clear that Sama knew exactly what he was doing in running his recruitment organization. As a matter of fact, during a September 2017 conversation with an undercover agent, Sama boasted that he was not a neophyte to the recruiting–for-pay process. He told the undercover that he recruited before and that he had been paid $750 per student by Silicon Valley University.

Moreover, Sama continually exerted his influence over his associates, as the leader and organizer of this illegal confederation during the entire breath of the conspiracy. On January 29, 2019, the day he and his co-conspirators were arrested,

a conference took place at the University's offices. The conference included Sama, several of his associates, and the undercover agents. Not surprisingly, Sama was holding court; orchestrating, organizing, and directing his associates up to the moments before their arrest. He was instructing each of the defendants who were present as to how many students each of them would enroll at the University in order to equitably maximize their profits, yet minimize their chances of drawing the unwanted attention of U.S. immigration authorities.

Sama may suggest his role in committing fraud and harboring illegal aliens for profit stemmed from his attempt to help foreign national students obtain an education—including for some students who sought to transfer from schools that were in danger of losing their accreditation.[1] But his and his students' aims were not so noble.

Their true intent could not be clearer. While "enrolled" at the University, one hundred percent of the foreign citizen students never spent a single second in a classroom. If it were truly about obtaining an education, the University would not

---

[1] These schools cater to "students" who want to exploit our foreign student education program. While they are the exception rather than the rule, unfortunately they do exist. Some of the "pay to stay" schools located around the United States that have been exposed over the years are: Prodee University; Neo-America Language School; Walter Jay M.D. Institute; the American College of Forensic Studies; Likie Fashion and Technology College; Tri-Valley University; Herguan University; the University of Northern Virginia; and the American College of Commerce and Technology.

have been able to attract anyone, because it had no teachers, classes, or educational services. Instead, Sama and the foreign nationals he recruited wanted to commit a fraud upon the United States. At the outset, Sama informed his recruits there would be no classes and no education. The "students" willingly paid thousands of dollars to the undercover agents so that they could obtain fraudulent documents (Form I-20's) that would allow them to illegally stay, re-enter, and work in the United States.

But Sama's conduct was much more offensive than that of his recruits. Once he knew exactly what the University was—a fraud—he, not the University, raised the idea of recruiting other students who would be willing to commit fraud. He did so in order to make money. Specifically, in exchange for finding and enlisting others to remain in the United States illegally, he received more than $160,000 in profits and tuition credits. Hence, his illegal arrangement with the University proved to be quite profitable for him.

Therefore, Sama's conduct necessitates a guidelines sentence, and there are no legitimate reasons to vary below that range. PSR ¶ 75. Nonetheless, under our immigration laws, Sama must be sentenced to at least 12 months in custody to permanently bar him from re-entering the United States. Such a bar is certainly fitting in this case, since Sama intentionally exploited our student visa system for his own financial gain. He did so with the full knowledge that most of his recruits wanted to illegally enter the United States job market while unlawfully remaining in the

United States. As a direct result of his actions, his recruited students—who were illegally working in the United States—deprived otherwise qualified individuals from obtaining employment or training.

### B.      Sentencing Reform Act factors

#### 1.      Seriousness of the offense

Sama's decision to conspire to harbor aliens and commit visa fraud is a serious offense, as indicated by Congress's decision to authorize up to five years in prison for the offense. *See* 18 U.S.C. § 371; (PSR, ¶ 54). Specifically in this case, the F-1 student visa program is designed to promote and encourage foreign students to study at American institutions. (PSR, ¶¶ 9–15). Once they finish their course of study, the students must leave within 15 days. (*Id.* at ¶ 15). The idea is that the students return to their native countries to share their new knowledge and skills for the betterment of themselves and their country. Accordingly, the F-1 student visa program is not a naturalization program—i.e., it is not intended to be a path to obtaining U.S. citizenship.

If he receives a guidelines sentence, Sama will be deported once he serves his sentence, and he will be permanently barred from returning to the United States in the future. And even without a permanent bar from a guidelines sentence, Sama will likely be deported, and there is no way to know whether he will return to the United States. Yet his likely deportation should not trigger a variance windfall.

The Sixth Circuit has been clear that 18 U.S.C. § 3553 requires that the defendant's sentence reflect the seriousness of the offense, promote respect for the law, and provide just punishment. *United States v. Musgrave*, 761 F.3d 602, 608 (6th Cir. 2014). Deportation is not part of the defendant's sentence. Many things that happen to a defendant following his conviction and sentence are "impermissible facts" in determining a sentence. *Id.* Things such as losing a professional license, paying legal fees, suffering embarrassment or a damaged reputation, or as is the case here, being deported, are not part of this Court's sentence.  "None of these things are [the defendant's] sentence. Nor are they consequences of his sentence," and a district court should therefore sentence the defendant "without considering these factors." *Id.*

Furthermore, Sama and his co-conspirators (his recruited students) ignored the purpose of the F-1 student visa program. In fact, Sama has remained in the United States since 2015, totaling over four years in the United States before he was arrested on January 31, 2019. (*Id.* at ¶ 1). Moreover, during his time with the University, Sama was responsible for recruiting and securing work authorization for approximately 600 other illegal aliens. As a result of Sama's actions these 600 illegal students took those jobs which could have gone to U.S. citizens or to other foreign students who were lawfully in the United States on valid visas.

### 2.   Deterrence, protection of the public, and nature and circumstances of the offense

As noted above, Sama will likely be deported, and thus the likelihood of him reengaging this same criminal conduct is highly unlikely. However, the Court's contemplation of §3553 factors regarding deterrence and protection of the public is not limited to whether the defendant is likely to be a recidivist. Rather, this Court is likewise required, in determining an appropriate sentence, to seek to deter others from committing such crimes and protect the public. This Court should do so in this instance. According to an SEVP summary issued by U.S. Immigration and Customs Enforcement in November 2016, 1.23 million foreign students were studying in the United States on student visas in 2016, and 8697 schools were certified to enroll international students.[2] A guideline sentence for Sama would invariably serve as a warning and act as deterrence to any of the other one million other foreign students that are currently studying on student visas in the United States who may contemplate engaging in similar conduct.

Additionally, this action and the related actions—19-cr-20024 and 19-cr-20025—have garnered considerable media attention since the indictments were unsealed. Presumably, the sentences in this case and the related cases will also receive media focus. As a result, strong sentences against Sama and the other

---

[2] https://www.ice.gov/doclib/sevis/pdf/byTheNumbersDec2016.pdf (p.2).

defendants would have a considerable chance of deterring other foreign students—and some schools—from abusing the F-1 student visa program. In addition, as indicated by the success Sama and the other defendants had in recruiting students to the University, their vast network of students and potential students, at the very least, could be deterred by guidelines sentences.

In light of the above, a deterrent prison sentence between 41 and 51 months is appropriate.

### 3.    Characteristics of the defendant

Sama indicated he has a loving and supportive family and friends, both in India and in the United States. (PSR, ¶ 49). He attended a university in India and obtained a degree in engineering, and he also earned a Master's degree from Silicon Valley University. Thus, he has received support, love, and opportunities that many defendants who appear before this Court have not, and yet he still chose to commit and become the most prolific offender involved in the instant offense.

As a result, Sama's personal characteristics counsel that a prison sentence of 41 - 51 months is appropriate.

### 4.    Need to avoid sentencing disparities

The Supreme Court reiterated in *Booker* that reducing sentencing disparities was Congress's basis statutory goal in passing the Federal Sentencing Guidelines. *United States v. Booker*, 543 U.S. 220, 250, 264 (2005). Thus, calculating and

analyzing the guidelines is the primary driver in avoiding unwanted sentencing disparities. *Id.* at 264 ("The district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing."). Indeed, by correctly calculating and considering the Sentencing Guidelines, the Court automatically gives "significant weight and consideration to the need to avoid unwarranted disparities." *Gall v. United States*, 552 U.S. 38, 54 (2007). A variance in this matter would result in unwanted sentencing disparities.

Furthermore, a variance based on deportation would be contrary to the dictates of 18 U.S.C. § 3553 (2)(A) which requires that the defendant's sentence reflect the seriousness of the offense (see above). By allowing the Court to consider deportation as grounds for a downward variance for illegally harboring aliens, it would invariably grant the Court the authority to vary for an alien yet bar similar such consideration for an equally culpable defendant, who happens to be a U.S. citizen, and not subject to deportation. In essence, it would reward an alien while punishing a United States citizen for committing the exact same offense. This is universally unfair and would likewise run afoul of 18 U.S.C. Section 3553(a)(6) which mandates that the Court's sentence should "… avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."

Therefore, this factor favors a prison sentence within the guidelines range of 41-51 months. However, the Court should also be mindful of the five other recruiters

charged in this case, along with the two recruiters charged in related cases, 19-cr-20024 and 19-cr-20025. Naveen Prathipati and Aswanth Nune, who each recruited less than twenty students, received a sentence of 12 months and a day, and Bharath Kakireddy, who was a co-conspirator with Sama, received a sentence of 18 months. Individually, Prathipati, Nune, and Kakireddy were not even close to being as prolific as Sama.

## CONCLUSION

For the reasons stated above, the government recommends this Court sentence Sama within the existing guideline range of 41–51 months.

Respectfully submitted,

MATTHEW SCHNEIDER
United States Attorney

*/s/ Ronald W. Waterstreet*
Timothy P. McDonald
Ronald W. Waterstreet
Brandon C. Helms
Assistant United States Attorneys
211 W. Fort Street, Suite 2001
Detroit, MI   48226
Phone: (313) 226.9100
Email: Ronald.Waterstreet@usdoj.gov
Email: Timothy. McDonald@usdoj.gov
Email: Brandon.Helms@usdoj.gov

Dated: September 5, 2019

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 5, 2019, I electronically filed the

foregoing paper with the Clerk of the Court using the ECF system, which will

provide notification to all counsel of record.


*/s/Ronald W. Waterstreet*
Ronald W. Waterstreet
Assistant United States Attorney
